UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

MARILYN MACHADO,

                       Plaintiff,

          -against-

ANDREW M. SAUL,[1]
Commissioner of Social Security,

                       Defendant.
----------------------------------------------------------------X

**OPINION AND ORDER**

18 Civ. 1498 (JCM)

       Plaintiff Marilyn Machado ("Plaintiff") commenced this action pursuant to 42 U.S.C. § 405(g), challenging the decision of the Commissioner of Social Security (the "Commissioner"), which denied Plaintiff's application for Supplemental Security Income ("SSI") benefits, finding her not disabled within the meaning of the Social Security Act (the "Act").[2] (Docket No. 1). Presently before this Court are (1) Plaintiff's motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, (Docket No. 18), and (2) the Commissioner's cross-motion for judgment on the pleadings, (Docket No. 19). For the reasons set forth herein, Plaintiff's motion is granted, the Commissioner's motion is denied, and the case is remanded for further proceedings consistent with this opinion.

---

[1] Andrew M. Saul is now the Commissioner of Social Security and is substituted for former Acting Commissioner Nancy Berryhill as the Defendant in this action, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

[2] This action is before the Court for all purposes on consent of the parties, pursuant to 28 U.S.C. § 636(c). (Docket No. 14).

## I.  BACKGROUND

Plaintiff was born on June 24, 1968 (R.[3] 28).  On May 19, 2014, Plaintiff applied for SSI, alleging that she was disabled beginning March 26, 2013. (R. 10).  The SSA denied the claim on August 18, 2014, and Plaintiff requested a hearing before an administrative law judge ("ALJ"). (R. 111).  Plaintiff appeared before ALJ Hilton Miller on August 4, 2016, November 9, 2016, and February 2, 2017. (R. 36, 78, 85).  On February 21, 2017, the ALJ issued a decision finding that Plaintiff was not disabled and therefore not eligible for SSI benefits. (R. 10-30).  The Appeals Council subsequently denied Plaintiff's request for review on December 18, 2017, and the decision of the ALJ became the Commissioner's final decision. (R. 1-3).

### A.  Medical Treatment for Plaintiff's Physical Impairments

Plaintiff visited Montefiore on November 18, 2013, complaining of low back, right hip and bilateral knee pain. (R. 473).  Plaintiff's treatment notes state that she suffered from hip and back pain as well as depression. (R. 475).  On December 11, 2013, an examination of Plaintiff's lumbar spine showed some pain and restriction of movement. (R. 471).  Dr. Maria Reyes observed that Plaintiff's pain was "aggravated by prolonged sitting, prolonged standing, or just staying in one position for a long time and going up and down stairs." (R. 472).   She found that Plaintiff's back pain was "likely due" to degenerative spine disease and recommended physical therapy. (R. 471).  X-rays of Plaintiff's hip taken on December 13, 2013 showed that there was "no acute fracture" and "no dislocation." (R. 477).  Further testing showed that Plaintiff's lumbar spine and forearm had "normal bone density" while her femur showed osteopenia. (R. 479).  At an office visit on December 19, 2013, Plaintiff complained of significant pain in her back and

---

[3] Refers to the certified administrative record of proceedings relating to Plaintiff's application for social security benefits, filed in this action on June 11, 2018. (Docket No. 17).  All page number citations to the certified administrative record refer to the page number assigned by the SSA.

right hip, but an x-ray of her right hip was unremarkable. (R. 518). On January 8, 2014, Plaintiff visited Dr. Sun Jim Kim in Montefiore's orthopedics department. (R. 516). Dr. Kim diagnosed Plaintiff with trochanteric bursitis in her right hip, which "causes pain over the outside of the upper thigh." (R. 517).

On February 5, 2014, Plaintiff was evaluated at the Federation Employment and Guidance Services ("FEGS"). (R. 546). Dr. Mohammad Shuja examined Plaintiff and observed mild tenderness in her lower back, hip and knee joint with some limitations in her range of motion. (R. 568). He diagnosed Plaintiff with a back disorder, joint disorder, depressive disorder, anxiety, and a calcaneal spur. (R. 573-74). Plaintiff returned to Montefiore's orthopedics department on February 12, 2014. (R. 513). Dr. Kim diagnosed Plaintiff with moderate osteoarthritis in her left knee. (R. 514). Plaintiff saw a podiatrist at Montefiore on the same day, who diagnosed Plaintiff with plantar fasciitis. (R. 511-12).

Plaintiff attended an initial appointment with Dr. Karen Stephenson at HELP/PSI Counseling Center on March 21, 2014. (R. 503). Plaintiff's physical examination was normal. (R. 503). An x-ray of Plaintiff's lumbar spine, taken on March 22, 2014, showed a "mild narrowing of the L2-L3 through L5-S1 disc spaces with mild dextrocurvature centered at the T-12-L1 disc space level and compensatory levocurvature centered at the L4-L5 disc space level." (R. 454). On March 25, 2014, Plaintiff visited Dr. Sydelle Ross at Brightpoint Health. (R. 716). Dr. Ross found that Plaintiff's lumbar paraspinal muscles were tender, she had pain due to facet loading, and she had limited range of motion in her back. (R. 717). Dr. Ross diagnosed Plaintiff with low back pain, joint pain in her pelvis, osteoarthritis, chronic knee pain, and plantar fasciitis. (R. 717).

Plaintiff attended physical therapy at Revival Physical Therapy & Rehabilitation Services on April 9, 2014. (R. 455). The physical therapist noted that Plaintiff tolerated treatment well and felt a little better after therapy. (R. 455). On April 11, 2014, Dr. Stephenson observed that Plaintiff had pain in her lumbar spine with range of motion and leg elevation. (R. 497). Plaintiff returned to Brightpoint on April 14, 2014. (R. 713). Plaintiff exhibited muscle pain, joint pain, knee pain and stiffness and reported difficulty walking and climbing stairs. (R. 714). Dr. Ross recommended medication and non-pharmacologic options for Plaintiff's chronic pain. (R. 714). At a follow-up appointment on April 28, 2014, Dr. Ross recommended physical therapy and a back brace. (R. 710-11).

Plaintiff was assessed at FEGS again on July 30, 2014. (R. 579). Plaintiff indicated that she traveled independently to her medical appointments and did not have travel limitations. (R. 580). Simone Spence, LMSW, noted that Plaintiff ambulated without an assistive device, had a normal gait, and did not appear in pain when sitting, standing or walking. (R. 584). LMSW Spence observed that Plaintiff's thoughts were scattered, and her mood was anxious and depressed. (R. 584).

On August 1, 2014, Plaintiff visited Dr. Ross complaining of "pain everywhere, especially in the right heel and left knee." (R. 708). Plaintiff reported 10/10 pain and noted that she was using a walker at times but found it inconvenient. (R. 708). A physical examination showed that Plaintiff's right heel was "markedly tender to palpation" and her left knee joint had tenderness and mild swelling. (R. 708). Plaintiff was told that knee replacement was the best treatment for her knee, but Plaintiff was "not ready from a psychosocial standpoint to proceed with surgery." (R. 708). Dr. Ross recommended medication and a heat/cold gel pad. (R. 709). On October 27, 2014, Plaintiff reported that her back pain improved with the use of a back brace

but her heel pain remained intense. (R. 706).  She indicated that her heel pain was 9/10 and she could not sleep due to the pain. (R. 706).  Dr. Ross found that Plaintiff's "[r]ight heel [was] exquisitely tender to palpation" and noted "swelling and erythema." (R. 706).  Plaintiff also had lumbosacral tenderness and an antalgic gait. (R. 706).  On November 17, 2014, Plaintiff reported severe pain in her right heel. (R. 704).  Plaintiff planned on seeing an orthopedist and podiatrist to receive knee and heel injections. (R. 704).  After conducting a physical examination, Dr. Ross found marked right heel tenderness to palpation and observed that Plaintiff had a "clearly antalgic" gait from not bearing weight on her right foot. (R. 704).  On December 15, 2014, Plaintiff reported continued pain in her lower back but stated that the back brace was somewhat helpful. (R. 702).  Plaintiff appeared fatigued, uncomfortable, depressed and agitated. (R. 702).  Dr. Ross found tenderness and a mild muscle spasm in Plaintiff's back. (R. 702).

Plaintiff continued to see Dr. Ross at Brightpoint regularly throughout 2015.  On January 12, 2015, Dr. Ross observed tenderness in Plaintiff's right heel and lumbosacral tenderness. (R. 700).  At a follow-up visit on February 23, 2015, Plaintiff indicated that she had not been able to make her physical therapy and orthopedic appointments due to the cold, but she planned on rescheduling them. (R. 698).  A physical examination showed lumbosacral tenderness, tenderness in both knees, and a slightly antalgic gait. (R. 698).  On March 23, 2015, Dr. Ross found tenderness in Plaintiff's back and knee joint. (R. 696).  At a follow-up visit with Dr. Ross on April 20, 2015, Plaintiff stated that she continued to have significant pain in her right heel that was not alleviated by treatment. (R. 692).  Dr. Ross found lumbosacral tenderness in Plaintiff's back and observed that she walked with a slight limp. (R. 692).

On June 10, 2015, Plaintiff visited orthopedics at Brightpoint for knee pain in both of her knees. (R. 630).  The treatment notes indicate that Plaintiff was taking medication and using a

back brace for her pain. (R. 630). Plaintiff saw Dr. Phat Tran at Brightpoint on December 7, 2015, complaining of pain in her lower back, both knees and her hands. (R. 688). Plaintiff reported that she was seeing an orthopedic surgeon for left knee replacement, but she was deferring the surgery. (R. 688). Plaintiff also reported that her hands were swelling and she was scheduled to see a rheumatologist. (R. 688-89). A physical examination showed lumbar tenderness, limited range of motion, and bilateral knee pain. (R. 689). Plaintiff saw Dr. Tran again on January 4, 2016, complaining of pain in her lower back, both knees and hands. (R. 684). Dr. Tran found swelling and tenderness in Plaintiff's left knee and back. (R. 685).

Plaintiff saw Dr. Amit Saxena, a rheumatologist, on January 12, 2016. (R. 727). In Plaintiff's left knee, Dr. Saxena found "[m]ild medial and lateral and mild to moderate patellofemoral compartment syndrome." (R. 728). There were also findings of "patellar maltracking," "[m]ild to moderate quads tendinosis," and "[s]mall knee jt effusion with mild synovitis decompressing into a small popliteal cyst." (R. 728). In Plaintiff's right knee, Dr. Saxena observed that there was a "small osteophyte along the lateral margin of the lateral patellar facet," "mild subchondral sclerosis and cystic change along the lateral patellar facet small bone spur likely secondary to mild osteoarthritis." (R. 728). He found a "5 degree dextrocurvature centered at T12-L1 disc space level," "[c]ompensatory levocurvature centered at L4-5 disc space level," "[m]ild narrowing of L-2-L3 through L5-S1 disc spaces," and "mild L4-L5 and L5-S1 facet arthrosis." (R. 729). A physical examination showed that Plaintiff's finger joints and right wrist were tender and painful upon palpation. (R. 728). She also had swelling in her right ankle, which was tender upon palpation. (R. 728).

At a follow-up appointment with Dr. Tran on February 17, 2016, Dr. Tran observed a slight edema in Plaintiff's extremities and mild swelling in her left knee. (R. 681). She had

tenderness in her lumbar spine and pain with range of motion in both knees. (R. 681). Plaintiff

saw Dr. Saxena again on March 15, 2016. (R. 723). He reviewed a hand x-ray that was within

normal limits. (R. 725). An x-ray of Plaintiff's sacroiliac joint showed minimal osteoarthritis

with subchondral sclerosis and mild osteophytosis. (R. 725). A knee x-ray showed small joint

effusion. (R. 725). An image of Plaintiff's right foot and ankle showed mild joint arthrosis and a

small plantar calcaneal spur, and an image of her left foot and ankle showed a small plantar

calcaneal spur, mild joint arthrosis, and bipartite tibial sesamoid. (R. 725). Dr. Saxena

recommended medication and Hyaluronate injections in both knees. (R. 726).

On May 24, 2016, Plaintiff told Dr. Saxena that the pain in her wrists and shoulder was

improving, but her knees still hurt. (R. 720). At a June 23, 2016 follow-up visit, Plaintiff

reported that her pain was improving, but she still felt pain in the morning and if she sat for too

long. (R. 915). Dr. Saxena recommended increasing medication and injections in Plaintiff's

knees. (R. 917). On September 28, 2016, Plaintiff presented with a new nodulosis on her hand.

(R. 919). She still had swelling in her fingers and interjoint areas and numbness and tingling in

her hands. (R. 919). Plaintiff reported being unable to get her injections covered by insurance.

(R. 919).

**B. Medical Treatment for Plaintiff's Mental Impairments**

On March 27, 2014, Plaintiff visited Alma Withim, LCSW, at HELP/PSI Counseling

Center, complaining of depression. (R. 464). LCSW Withim diagnosed Plaintiff with post-

traumatic stress disorder and severe recurrent major depression with psychotic features. (R. 465).

On April 9, 2014, Nurse Practitioner Shoshannah Pearlman diagnosed Plaintiff with post-

traumatic stress disorder, severe recurrent major depression with psychotic features and

trichtotillomania. (R. 634). NP Pearman noted that Plaintiff was living in a shelter with her

children and that she had a pervasive history of abuse, trauma and anxiety. (R. 634). She recommended weekly psychotherapy and bi-weekly medication management until Plaintiff was stabilized. (R. 634).

Plaintiff attended medication management sessions with NP Pearlman on April 23, 2014, May 5, 2014, May 27, 2014, June 27, 2014, July 22, 2014, August 19, 2014, September 19, 2014, and October 8, 2014. (R. 490, 636, 640, 648, 658, 664, 671). NP Pearlman found that Plaintiff was compliant with her psychotropic medications and appeared to be improving and less anxious. (R. 490, 640). At other times Plaintiff reported increased anxiety and depression. (R. 654, 658). Plaintiff visited LCSW Withim on May 28, 2014 to set up a care plan and weekly psychotherapy appointments. (R. 642-43). Plaintiff attended sessions with LCSW Withim on June 12, 2014, June 19, 2014, July 3, 2014, and July 17, 2014. (R. 644, 646, 650, 652). Plaintiff reported increased anxiety, depression and pain at her July 17, 2014 appointment. (R. 652). Plaintiff was also diagnosed with obsessive compulsive disorder. (R. 652).

Plaintiff attended therapy with LCSW Marisol Rios on July 31, 2014 and reported feeling very anxious and nervous due to violence at the shelter and concerns over her son. (R. 656). LCSW Rios observed that Plaintiff's affect was anxious, worried and panicked. (R. 656). Her thought form and thought content were appropriate and she denied suicidal or homicidal ideation. (R. 656). Plaintiff attended follow-up sessions with LCSW Rios on August 27, 2014, September 11, 2014, September 26, 2014, and January 6, 2015. (R. 660, 667, 669, 679). Plaintiff consistently reported feeling anxious and depressed.

## C.  Opinion Evidence from Treating Physicians[4]

By letter, dated August 13, 2014, Dr. Kim from Montefiore stated that Plaintiff was diagnosed with bilateral severe osteoarthritis and she was unable to climb up and down stairs. (R. 596).  An undated letter from Dr. Ross indicated that Plaintiff suffered from chronic back pain, chronic knee pain, and heel spurs. (R. 595).  Dr. Ross opined that she was unable to walk up and down stairs due to her condition. (R. 595).

On February 5, 2014, Dr. Shuja opined on Plaintiff's exertional and non-exertional limitations.  He stated that Plaintiff could lift, push and pull 5 pounds about 1 to 4 times per hour. (R. 569). She had limitations kneeling, squatting, bending, crouching and stooping. (R. 569-70). However, she had no limitations standing, walking, or manipulating with her hands. (R. 569-70). With respect to non-exertional limitations, Dr. Shuja concluded that Plaintiff had limitations relating appropriately to co-workers and supervisors due to her anxiety. (R. 571).

Plaintiff's treating rheumatologist, Dr. Saxena, submitted a report on her behalf on October 14, 2016. (R. 892).  Dr. Saxena indicated that he saw Plaintiff every three months beginning on January 12, 2016. (R. 892).  He diagnosed Plaintiff with seronegative rheumatoid arthritis and osteoarthritis and stated that her medical conditions were expected to last at least twelve months. (R. 892-93).  He noted that Plaintiff suffered from pain in her knees and ankles, consistent with osteoarthritis. (R. 893).  Plaintiff also had swelling in her fingers and wrists, which was consistent with seronegative rheumatoid arthritis. (R. 893).  In support of his opinion, Dr. Saxena cited to x-rays of Plaintiff's knees that showed osteoarthritic changes, osteophytes

---

[4] On October 17, 2016, Nurse Practitioner Patrick Tigenoah submitted a report on Plaintiff's behalf. (R. 942).  He opined that Plaintiff suffered from both marked and moderate limitations. (R. 635-42).  However, because nurse practitioners are "not listed as 'acceptable medical sources,' they cannot be 'treating sources,' and cannot even give 'medical opinions.'" *Wider v. Colvin*, 245 F. Supp. 3d 381, 389 (E.D.N.Y. 2017).  An ALJ is, therefore, not required to give the opinion of a nurse practitioner any weight. *Id.*

and bone spurs. (R. 893). He also cited to results from blood tests that showed Plaintiff had abnormally elevated levels of "Serum C-reactive Protein" and "ESR," two markers used to detect inflammation. (R. 893). According to Dr. Saxena, Plaintiff's osteoarthritis and rheumatoid arthritis caused localized inflammation in her joints that made it painful and difficult for her ambulate and articulate with her hands. (R. 893). Dr. Saxena noted that Plaintiff was being treated with Sulfasalazine, Methotrexate and Naproxen, which caused side effects of gastrointestinal upset, fatigue, hair loss and anemia. (R. 894).

Dr. Saxena opined that in an eight-hour workday, Plaintiff could sit continuously for one hour and a total of four hours. (R. 895). She was not capable of standing continuously at a work station without moving or walking continuously. (R. 895). Plaintiff could occasionally lift up to five pounds, but she could never bend, squat, crawl, climb or reach. (R. 895-96). She could also never use her feet for repetitive movements. (R. 896). Nor could she push, pull or manipulate with her hands. (R. 896-97). Dr. Saxena indicated that Plaintiff had difficulty traveling alone on a daily basis by bus or by subway because she had difficulty ambulating due to her arthritis. (R. 897).

### D. Opinion Evidence from Consulting Physicians

There are reports from five consultative examiners in the record and testimony from two consultative physicians.

### 1. Marilee Mescon, M.D.

Dr. Marilee Mescon conducted an internal medicine examination on August 11, 2014. (R. 528). Plaintiff reported that she had back pain since 2007 and used a back brace. (R. 528). She indicated being able to sit for half an hour, stand for one and a half hours, and walk for half an hour. (R. 528). Plaintiff also reported bilateral knee pain, which she reported as throbbing and burning. (R. 528). Plaintiff received cortisone injections every three months, but they did not

alleviate the pain. (R. 528). According to Plaintiff, she developed heel spurs in 2009 in her right foot, which were a 10/10 on the pain scale. (R. 529). Plaintiff was able to cook, clean, do laundry and shop. (R. 529). She could also shower, bathe and dress, and she spent her time watching television and performing household chores. (R. 530).

Dr. Mescon observed that Plaintiff appeared to be in no acute distress and that her gait was normal. (R. 530). Plaintiff walked on the toes of both feet with difficulty, could squat fully, and was able to rise from her chair without difficulty. (R. 530). An examination of Plaintiff's cervical and lumbar spine was normal, as was a physical examination of her extremities and finger dexterity. (R. 531). Dr. Mescon diagnosed Plaintiff with back pain, bilateral knee pain and heel spurs and determined that her long-term prognosis was fair. (R. 531). Dr. Mescon concluded that Plaintiff did not have any limitations in her ability to sit, stand, climb, push, pull or carry heavy objects. (R. 531).

## 2. Fredelyn Damari, Ph.D.

Dr. Fredelyn Damari conducted a psychiatric evaluation on August 11, 2014. (R. 532). Plaintiff indicated that she received medical transportation from Medicaid to attend the examination. (R. 532). Plaintiff had grown children ages 28, 25, 27, and 22 and lived with her 8-year-old son. (R. 532). Plaintiff previously lived in Florida for twelve years, but she came to New York in 2013 to escape domestic violence. (R. 532). Plaintiff attended seventh grade in Puerto Rico and she did not have a high school diploma. (R. 532). Plaintiff's last employment was for 90 days working as a medical secretary. (R. 532). She left the job when she moved to New York and reported being unable to work due to excruciating pain in her back, knees and heels. (R. 532). In terms of daily living, Plaintiff was able to dress, shower, groom herself, cook, clean, and do laundry. (R. 534). She went shopping about every two weeks and was able to manage her own money. (R. 534). She did not drive, but instead took medical transportation

provided through Medicaid. (R. 534).  Most of Plaintiff's adult children still lived in Florida, but her 8-year-old son lived with her in New York. (R. 535).  Plaintiff indicated that she spent her days watching television. (R. 535).

Plaintiff reported an attempted suicide back in 1987. (R. 532). She attended a domestic violence group on a weekly basis and saw a psychiatrist and therapist. (R. 532).  Plaintiff reported dysphoric moods, feelings of hopelessness, and irritability. (R. 533).  She also reported anxiety and panic attacks due to issues with the shelter where she stayed. (R. 533).  She denied manic symptomology and thoughts of death or suicide. (R. 533).

Dr. Damari observed that Plaintiff's attention and concentration were mildly impaired due to nervousness. (R. 534).  Plaintiff was able to count by 2s until 20, do simple arithmetic, and make change from a dollar. (R. 534).  She made errors counting backward from 20 by 3s. (R. 534).  Plaintiff's memory was also mildly impaired. (R. 534).  She was able to repeat 3 out of 3 objects immediately, but she was unable to recall any of the objects after 5 minutes. (R. 534).  She was able to repeat 4 and 5 digits forward and 3 digits backward. (R. 534).

Dr. Damari diagnosed Plaintiff with adjustment disorder with anxiety with a good prognosis. (R. 535).  He opined that Plaintiff was capable of following and understanding simple directions and instructions, performing simple tasks independently, and maintaining attention and concentration. (R. 535).  She was also able to make appropriate decisions and relate adequately with others. (R. 535).  However, Plaintiff was mildly impaired in her ability to appropriately deal with stress. (R. 535).

### 3.  S. Juriga, Ph.D.

On August 19, 2014, state agency psychological consultant Dr. S. Juriga reviewed the record and determined that Plaintiff did not have a severe mental impairment. (R. 98-99).

**4. Ram Ravi, M.D.**

Dr. Ram Ravi conducted an orthopedic examination on September 9, 2016 and completed a medical source statement. (R. 865, 869). According to Plaintiff, she was diagnosed with osteoporosis and rheumatoid arthritis and was seeing specialists for these conditions. (R. 865). Plaintiff stated that her activities of daily living, including showering, dressing, laundry and shopping, were limited due to pain. (R. 866). She cleaned twice a week and spent her time watching television. (R. 866).

Plaintiff's gait was moderately antalgic and she was unable to walk on her heels and toes. (R. 866). She could squat only 15% of the maximum and complained of discomfort when standing. (R. 866). Plaintiff did not use an assistive device and was able to rise from her chair without difficulty. (R. 866). A physical examination of Plaintiff's cervical and lumbar spine and upper and lower extremities was unremarkable. (R. 866-67).

Dr. Ravi concluded that Plaintiff had no limitations sitting and mild limitations standing, bending, pushing, pulling, lifting, and carrying. (R. 867). He recommended that Plaintiff avoid driving and squatting. (R. 867).

**5. Erica King-Toler, Ph.D.**

Dr. Erica King-Toler conducted a psychiatric evaluation on September 9, 2016 and completed a medical source statement. (R. 878, 883). Plaintiff stated that she received support from her adult children in order to perform her activities of daily living. (R. 880). She reported having difficulty dressing, bathing, grooming herself, cooking, cleaning, and shopping. (R. 880). Plaintiff could manage money and take public transportation, but she felt anxious taking public transportation. (R. 880). She also stated that she felt socially isolated and spent her days caring for her son, performing activities of daily living, and attending medical appointments. (R. 880).

Plaintiff's attention and concentration were mildly impaired. (R. 880).  She was able to do simple arithmetic problems, but she was unable to count backwards from 20 by 3s. (R. 880).  Plaintiff's memory was also mildly impaired. (R. 880).  She was able to recall 3 of 3 objects immediately and 2 of 3 objects after 5 minutes. (R. 880).  She was able to recall 4 digits forward and none backwards. (R. 880).  Dr. King-Toler found that Plaintiff's cognitive functioning was borderline and her general fund of information was somewhat limited. (R. 880).

Dr. King-Toler diagnosed Plaintiff with major depressive disorder, panic disorder, and generalized anxiety disorder with a fair prognosis. (R. 881).  She opined that Plaintiff had mild limitations making appropriate decisions. (R. 881).  She had moderate limitations following and understanding simple directions and instructions, learning new tasks, and relating adequately with others. (R. 880-81).  She had marked limitations performing simple tasks independently, maintaining attention and concentration, maintaining a regular schedule, performing complex tasks independently, and appropriately dealing with stress. (R. 881).  Dr. King-Toler concluded that the results of her examination were consistent with psychiatric problems and could significantly interfere with Plaintiff's ability to function on a daily basis. (R. 881).

**6. Howard Shapiro, M.D.**

Dr. Howard Shapiro testified before the ALJ on February 2, 2017 as an expert in internal medicine and enterology. (R. 51-52).  Based upon his review of the record, Dr. Shapiro opined that Plaintiff suffered from morbid obesity and "probable rheumatoid arthritis" that was diagnosed in May of 2016. (R. 53).  He opined that Plaintiff was capable of lifting and carrying 20 pounds, standing for 3 hours during the workday, walking for 3 hours and sitting for 6 hours. (R. 53).  According to Dr. Shapiro, Plaintiff was unable to walk on scaffolding or be at unprotected heights and could not work around machinery or operate foot pedals. (R. 53).  He

determined that Plaintiff was able to use ramps and stairs occasionally and could push and pull. (R. 54). He also testified that Plaintiff was capable of manipulating with her hands. (R. 54).

When asked by Plaintiff's counsel whether he reviewed and considered the records of her treating doctors in making his evaluation, Dr. Shapiro responded that "as a general rule" he gave greater weight to the independent consultative examiners than Plaintiff's treating physicians because "the treating physician provides a less objective assessment than the independent evaluator." (R. 57-60).

**7. Sharon Khan, M.D.**

Dr. Sharon Khan, a psychologist, testified before the ALJ. (R. 63). Dr. Khan opined that based upon her review of Plaintiff's records, Plaintiff did not have any severe impairments but had several work-related functional limitations. (R. 63). According to Dr. Khan, Plaintiff had moderate limitations maintaining a regular schedule, mild to moderate limitations getting along with others, and mild limitations in her ability to regulate her behavior. (R. 64). Plaintiff was limited to simple and repetitive tasks. (R. 64).

**E. Plaintiff's Testimony**

Plaintiff testified that she was 48 years old. (R. 41). The highest grade of school she completed was seventh grade. (R. 41). She had five children, ages 31, 29, 27, 24 and 10. (R. 41). Plaintiff indicated that she did not have any hobbies and she spent her days taking her youngest son to school, attending physical therapy, and seeing her psychiatrist and therapist. (R. 41). Plaintiff did not drive and took her son to school using public transportation. (R. 42). She stated that she could prepare meals for her son and engage in personal care, but she was unable to clean without the help of her children. (R. 42-43). Plaintiff's last employment was in 2012. (R. 43). She was a housewife from 1990 to 2000, worked from 2001 until 2005, and then worked

intermittently in 2011 and 2012. (R. 44). Plaintiff testified that her depression interfered with her ability to work. (R. 43).

Plaintiff testified that she suffered from depression and anxiety, in part due to traumatic events from her childhood. (R. 40). She also suffered from rheumatoid arthritis that caused severe pain in her joints and back. (R. 40-41). She saw rheumatologist Dr. Saxena every three months and took steroids and Methotrexate for her condition. (R. 47). According to Plaintiff, she could not sit for longer than 15 to 20 minutes without experiencing pain. (R. 48). Nor could she stand continuously for longer than half an hour. (R. 48). Plaintiff used a walker and could not walk further than a block. (R. 49). She also could not carry more than 5 to 10 pounds.

Plaintiff stated that she took Duloxetine and Buspirone for her anxiety and depression. (R. 50). Her depression made it difficult for her to want to do anything or go anywhere, and some mornings she needed to rely on her older daughter to take her son to school. (R. 50-51).

## F. Vocational Expert's Testimony

At the February 2, 2017 hearing vocational expert Bruce Growick also testified. (R. 70). He stated that Plaintiff had past relevant work as a medical secretary, which was sedentary and semi-skilled. (R. 71). The ALJ posed the following residual functional capacity ("RFC") hypothetical to Mr. Growick:

> [A] hypothetical individual of the claimant's age, education, work experience. Has the residual functional capacity to lift and/or carry up to 10 pounds occasionally, 10 pounds frequently. Stand and/or walk with normal breaks for a total of about two hours in an eight hour workday. Sit with normal breaks for a total of about six hours in an eight hour workday. Can occasionally climb ramps and stairs. No ladders, ropes or scaffolds. Occasionally balance, kneel, crouch, squat and no crawling. Does not require manipulation utilizing the bilateral lower extremities such as foot controls or foot pedals. Does not involve hazards such as dangerous machinery, motor vehicles, unprotected heights or vibrations. Avoids temperature extreme. Frequent fine and gross manipulation. That further takes into account non-exertional limitation allowing the performance of simple, routine and repetitive

tasks that could be explained. Specifically SVPs 1 and 2 which involve making simple decisions. Occasional changes in routine and occasional contact with others.

(R. 71-72). Based on the assumptions provided by the ALJ, Mr. Growick testified that such an individual could not return to Plaintiff's past work as a secretary, but there was "other unskilled light work that can be performed." (R. 72). The ALJ reminded Mr. Growick that the hypothetical individual was limited to sedentary work. (R. 72). Mr. Growick testified that Plaintiff could perform work as a bench assembler, a quality insurance inspector, and a surveillance system monitor. (R. 73-74). On cross-examination, Mr. Growick testified that if the hypothetical individual could only occasionally use fine and gross motor movements with her hands, had marked limitations with interacting with supervisors, or could only occasionally push and pull, the person would be unable to perform any jobs. (R. 75-76).

## G. ALJ Miller's Decision

In his decision, dated February 21, 2017, ALJ Miller followed the five-step procedure established by the Commissioner for evaluating whether an individual is disabled. *See* 20 C.F.R. § 416.920. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since May 19, 2014, the application date. (R. 12). At step two, the ALJ found that Plaintiff had the following severe impairments: carpal tunnel syndrome, osteoporosis, rheumatoid arthritis, left knee disorder, plantar fasciitis, obesity, depression disorder and anxiety disorder. (R. 12). At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix I. (R. 12).

Before step four of the sequential evaluation, the ALJ made the following RFC assessment:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except she can lift and carry up to 10 pounds occasionally and 10 pounds frequently. She can stand and/or walk for a total of about 2 hours, and sit for a total of about 6 hours in an 8-hour workday. The claimant can occasionally climb ramps and stairs, and never climb ladders, ropes, or scaffolds. She can occasionally balance, kneel, crouch, and squat, and [s]he can never crawl. The claimant is limited to work not requiring manipulation using the bilateral lower extremities, such as foot controls or pedals, and not involving hazards such as machinery, operating motor vehicles, unprotected heights, or vibrations. The claimant must avoid temperature extremes, and she can perform fine and gross manipulation frequently with the bilateral upper extremities. In addition, the claimant is limited to performing simple, routine, and repetitive tasks that can be explained, specifically with SVP 1-2, requiring only simple decision-making and involving only occasional changes in routine and only occasional contact with others.

(R. 16). At step four, the ALJ found that Plaintiff could no longer perform any past relevant work. (R. 28). Proceeding to step five, the ALJ considered Plaintiff's age, education, work experience and RFC, and concluded that Plaintiff could perform work that exists in significant numbers in the national economy. (R. 29). Relying upon the testimony of the vocational expert, ALJ Miller found that Plaintiff could perform work as a bench assembler, an inspector of quality assurance, and a surveillance system monitor. (R. 29). The ALJ, therefore, determined that Plaintiff was not disabled. (R. 29).

## II. DISCUSSION

Plaintiff argues that remand is warranted because (1) the ALJ failed to give controlling weight to the opinion of Plaintiff's treating rheumatologist; (2) the ALJ's RFC determination is not supported by substantial evidence; and (3) the Commissioner failed to satisfy his burden at step 5 of the sequential analysis.

## A. Treating Physician Rule

Plaintiff argues that the ALJ committed legal error by failing to provide good reasons for assigning diminished weight to Dr. Saxena's opinion because he did not expressly consider the

requisite factors. (Pl. Br. at 19-20). In response, the Commissioner maintains that the ALJ properly accorded Dr. Saxena's opinion some, but not controlling, weight because he considered the consistency of Dr. Saxena's opinion with the entire medical record. (Def. Br. at 18-20).

"Social Security Administration regulations, as well as [Second Circuit] precedent, mandate specific procedures that an ALJ must follow in determining the appropriate weight to assign a treating physician's opinion." *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019). "First, the ALJ must decide whether the opinion is entitled to controlling weight." *Id.* The ALJ must afford controlling weight to a treating physician's opinion as to the nature and severity of the impairment if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Id.* (citing *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008)). If there is substantial evidence in the record that contradicts or questions the credibility of a treating source's assessment, the ALJ may give that treating source's opinion less deference. *See Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (finding that treating physician's opinions were not entitled to controlling weight because they were not supported by substantial evidence in the record).

Second, if the ALJ does not give controlling weight to a treating source's opinion, the ALJ must consider various factors and provide "good reasons" for the weight given. 20 C.F.R. § 416.927(c)(2)-(6); *see also Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015). These include the following "nonexclusive '*Burgess* factors': (1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Estrella*, 925 F.3d at 95-96 (citing *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013)). "[T]o override the opinion of the treating physician . . . the ALJ must explicitly consider" the foregoing

factors. *Greek*, 802 F.3d at 375 (alteration in original) (quoting *Selian*, 708 F.3d at 418). "An

ALJ's failure to 'explicitly' apply the *Burgess* factors when assigning weight at step two is a

procedural error." *Estrella*, 925 F.3d at 96. If the ALJ does not "explicitly" consider these

factors, the case must be remanded unless "a searching review of the record" assures the Court

that the ALJ applied "the substance of the treating physician rule." *Id.*

Application of the treating physician rule within this Circuit is "robust," (*Corporan v.*

*Comm'r of Soc. Sec.*, No. 12 Civ. 6704 (JPO), 2015 WL 321832, at *24 (S.D.N.Y. Jan. 23,

2015)), and the Second Circuit has warned that it will "continue remanding when we encounter

opinions from ALJ[]s that do not comprehensively set forth reasons for the weight assigned to a

treating physician's opinion." *Halloran*, 362 F.3d at 33.

Here, the ALJ assigned "some weight" to Dr. Saxena's opinion and provided the

following two reasons:

> [Dr. Saxena's opinion] is afforded only some weight, as it is more restrictive than
> indicated by the objective and treating evidence of record as a whole. In addition,
> while this opinion adequately considers the claimant's subjective complaints, it
> does not sufficiently consider the claimant's own-reported retained physical
> capacity to perform tasks such as activities of daily living despite her severe
> musculoskeletal and immune system impairments.

(R. 27). The Commissioner argues that the ALJ adhered to the treating physician rule

because he properly addressed the second, third and fourth *Burgess* factors, which require

the ALJ to examine the evidence supporting the ALJ's opinion, the opinion's consistency

with the medical evidence, and the treating physician's specialty. (Def. Br. at 17-18).

The Court disagrees.

The ALJ did not expressly consider the frequency, length, nature and extent of

Plaintiff's treatment with Dr. Saxena or discuss the treatment notes from Dr. Saxena

beyond Plaintiff's initial meeting with him in January of 2016. The decision makes no

mention of the nine-month treating relationship between Dr. Saxena and Plaintiff.

Failure to do so was procedural error. *See Estrella*, 925 F.3d at 96 (ALJ's failure to

"'explicitly consider' the first *Burgess* factor" violated the treating physician rule).

Expressly considering the first *Burgess* factor is particularly important because the

purpose of the treating physician rule is to give more weight to medical opinions that can

provide "a detailed, longitudinal picture of [any] medical impairment(s) and may bring a

unique perspective to the medical evidence that cannot be obtained from the objective

medical findings alone or from reports of individual examinations, such as consultative

examinations or brief hospitalizations." *Flynn v. Comm'r of Soc. Sec.*, 729 Fed. Appx.

119, 122 (2d Cir. 2018). Indeed, "[e]ven where a treating physician's opinion is not

entitled to 'controlling weight,' it is generally entitled to 'more weight' than the opinions

of non-treating and non-examining sources." *Marcano v. Berryhill*, No. 16 Civ. 8033

(DF), 2018 WL 2316340, at *18 (S.D.N.Y. Apr. 30, 2018).

   While the ALJ noted Dr. Saxena's specialty as a rheumatologist, he did not

explicitly discuss it as a factor when deciding the appropriate weight to assign Dr.

Saxena's opinion. Finally, although the ALJ stated that Dr. Saxena's opinion "is more

restrictive than indicated by the objective and treating evidence of record as a whole," the

ALJ did not identify which "objective and treating evidence" he believes contradicts -- or

supports -- Dr. Saxena's opinion. *See Craig v. Comm'r of Soc Sec.*, 218 F. Supp. 3d 249,

267 (S.D.N.Y. 2016) (remand warranted where "the ALJ did not explain what was

contradictory between [the other evidence] and [the treating physician's] opinion."). The

Commissioner provides a more thorough discussion of the consistency of Dr. Saxena's

opinion with other evidence in the record. However, these comparisons were not made

by the ALJ in the context of his weighing Dr. Saxena's opinion, and the Court agrees with Plaintiff that the Commissioner's argument amounts to a *post hoc* analysis of the weight afforded to Dr. Saxena's opinion that is "not apparent from the face of the ALJ's decision." *Wolfanger v. Colvin*, No. 16 Civ. 6688 (MAT), 2018 WL 2425811, at *3 (W.D.N.Y. May 30, 2018).

A "searching review of the record" does not assure the Court that the substance of the treating physician rule was not violated. *Estrella*, 925 F.3d at 96. Treatment notes from Dr. Saxena which were not mentioned by the ALJ show a more significant impairment than the ALJ recognized. For example, Plaintiff consistently presented with tenderness, swelling and pain in her hands and wrists, and Dr. Saxena recommended increases in her medication at follow-up appointments. (R. 720, 728, 915, 917, 919). Despite treatment, Plaintiff presented with a new nodulosis on her hand at her September 28, 2016 appointment with Dr. Saxena and continued to have swelling in her fingers and numbness and tingling in her hands. (R. 919). Limitations identified by Dr. Saxena are also consistent with limitations identified by Plaintiff's other treating physicians, which were not cited by the ALJ. For example, Dr. Kim, Plaintiff's orthopedist who treated her in 2014, opined that Plaintiff was unable to climb up and down stairs. (R. 596). Dr. Ross, who treated Plaintiff regularly from 2014 to 2015, similarly opined that Plaintiff could not climb stairs. (R. 595).

Additionally, the Court is not assured that the substance of the treating physician rule was applied correctly because the only opinion in the record the ALJ assigned great weight to was from Dr. Shapiro, a specialist in enterology[5] who never examined Plaintiff.

---

[5] Enterology is the branch of medicine concerned with disorders of the intestinal tract.

(R. 27, 924). Dr. Shapiro admitted that he did not give significant weight to the treatment notes of Plaintiff's treating rheumatologist because he was under the (mistaken) impression that the SSA's policy was to give greater weight to the notes of independent consultative examiners who did not have a treating relationship with the claimant. (R. 55-60). The specific factual bases for Dr. Shapiro's opinions are unclear because he was unable to confirm that he reviewed the records of Plaintiff's treating physicians when asked by Plaintiff's counsel and appeared to misapprehend Plaintiff's surgical history. (R. 56-57). In addition, Dr. Shapiro never examined Plaintiff and only cited to the one-time examinations of Plaintiff's consultative physicians in support of his position. (R. 57). Furthermore, the hearing transcript shows significant communication issues between the ALJ, Dr. Shapiro, and Plaintiff's attorney due to a faulty telephone connection. There are multiple instances where the ALJ misheard Dr. Shapiro's testimony. (R. 54, 58, 60). In addition, Dr. Shapiro was nonresponsive to questions posed by Plaintiff's attorney inquiring which documents he considered in reaching his conclusions and whether his opinion was consistent with the notes from Plaintiff's treating physicians. (R. 55-62).

The differences between Dr. Saxena's and Dr. Shapiro's opinions are material to Plaintiff's RFC and the Commissioner's burden at step five of the sequential analysis. For example, Dr. Saxena opined that Plaintiff was not capable of pushing, pulling or manipulating with her hands. (R. 896). In contrast, Dr. Shapiro concluded that Plaintiff was able to push and pull up to 20 pounds and could perform fine and gross manipulation with her hands without difficulty. (R. 54). In his RFC determination, the ALJ concluded that Plaintiff was able to frequently manipulate with her hands and was silent as to Plaintiff's ability to push or pull. (R. 16). The vocational expert testified that if Plaintiff

was capable of only occasionally pushing or pulling or occasionally manipulating with her hands, she would not be able to perform any jobs. (R. 75-76). Without a comprehensive set of reasons explaining why the ALJ afforded great weight to Dr. Shapiro's opinion while only assigning some weight to Dr. Saxena's opinion, the Court cannot say that the procedural error was harmless.

Accordingly, remand is warranted. On remand, when formulating the appropriate RFC, the ALJ should explicitly and more thoroughly discuss all the *Burgess* factors in determining the appropriate weight to afford Dr. Saxena's opinion.

## B. Plaintiff's Remaining Arguments

Plaintiff argues that the ALJ's findings are not supported by substantial evidence and that the Commissioner has not met its burden at step five of the sequential analysis. (Pl. Br. at 20, 24). As discussed above, the ALJ erroneously applied the treating physician rule, and this legal error prevents the Court from determining whether the ALJ's decision is supported by substantial evidence. *See Wallace v. Berryhill*, No. 14 Civ. 2066 (NSR)(LMS), 2017 WL 9534743, at *14 (S.D.N.Y. Aug. 14, 2014), *report and recommendation adopted by* 2017 WL 4011494 (S.D.N.Y. Sept. 11, 2017) (legal errors in the ALJ's decision such as failing to follow the treating physician rule "preclude the [Court] from determining whether the ALJ's decision is supported by substantial evidence.").

## III. CONCLUSION

For the foregoing reasons, Plaintiff's motion is granted, the Commissioner's cross-motion is denied, and the case is remanded for further proceedings consistent with this opinion. The

Clerk is respectfully requested to terminate the pending motions (Docket Nos. 18, 19) and close the case.

Dated:   July 17, 2019
         White Plains, New York

                                        **SO ORDERED:**

                                        _Judith C. McCarthy_____
                                        JUDITH C. McCARTHY
                                        United States Magistrate Judge